IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMANDA SIMA,

    Plaintiff,

v.

NELSON, MULLINS, RILEY & SCARBOROUGH LLP, ASHLEY SUMMER, ESQ.

    Defendants.

## COMPLAINT FOR DAMAGES AND JURY DEMAND

1. Comes now Plaintiff Amanda Sima, and her Complaint for damages and jury demand against Defendants Nelson, Mullins, Riley & Scarborough LLP and Ashley Summer, Esq., allege and state as follows:

## THE PARTIES

2. Plaintiff, Amanda Sima, is and was at all material times residing in Castle Pines, Colorado.

3. Nelson, Mullins, Riley & Scarborough LLP is a U.S. law firm and lobby group headquartered in Columbia, South Carolina with 33 offices nationwide.

4. Defendant, Ashley Summer, is and was at all material times residing in New York.

## JURISDICTION AND VENUE

6. Venue in this judicial district is proper under 28 U.S. Code § 1332. Diversity of citizenship exists among all parties, and the damages sought exceed $75,000. Defendants have business relations within the district of this court.

## STATEMENT OF THE CASE

7. In 2013, the Plaintiff designed a spill-proof lid for children, which she later branded JoJo Cups. In November of 2017, the Plaintiff began to work full-time on JoJo Cups and, as such, started confidentially pursuing very critical, important early-stage tasks like patent protection and contract manufacturing. Waddington North America, Inc. was one such corporation that the Plaintiff contacted multiple times, with confidential measures in place, regarding contract manufacturing of her lid design.

8. From February 2019 to May 2019, the Plaintiff was also in communication with T.J. Godlewski of F.M. Turner Company regarding his potential sales representation of JoJo Cups. During this time, the Plaintiff and Mr. Godlewski agreed to work together, and exchanged confidential, internal materials. Unbeknownst to the Plaintiff, Mr. Godlewski was also representing Waddington North America in the same product category.

9. On July 26, 2019, the Plaintiff discovered Waddington North America had a product in the market that was identical to JoJo Cups in terms of utility, and nearly identical in design. Their marketing materials were also nearly identical to the internal materials she had shared with Mr. Godlewski.

10. In 2021, the Plaintiff discovered Waddington North America had applied for a

design patent of their copycat product in March of 2019, three weeks after she was in contact with Mr. Godlewski.  On September 19, 2022, she discovered Waddington North America was granted a utility patent for the copycat product.

11. On the same day she discovered the utility patent, the Plaintiff drafted and sent an open letter to Novolex Holdings, now the parent company of Waddington North America, regarding her claims of product theft.  Lori Goldin, Deputy General Counsel for Novolex, responded to the Plaintiff that the company was in receipt of her letter and would investigate her claims.  Also during this time, the Plaintiff consulted multiple law firms about pursuing a variety of claims, including but not limited to, trade secret theft, unfair business practices, unjust enrichment, and breach of contract.  She consulted attorneys Alyssa Moscarino, Justin Barker, and Michael Montgomery from the law firm Benesch, Friedlander, Coplan, Aronoff, LLP on October 6, 2022.

12. On October 11, 2022, Attorney Moscarino contacted the Plaintiff, stating she wanted to schedule a phone call regarding their thoughts on her claims as a follow up to their initial consultation.  They scheduled a time for Attorney Moscarino to contact the Plaintiff directly on her mobile phone.

13. After added pressure from the Plaintiff, Ms. Goldin emailed her on October 12, 2022 that Novolex was open to a conversation between counsels regarding a settlement arrangement, and directed her to their outside counsel, Ashley Summer, a New York-based partner with Nelson Mullins Riley & Scarborough Law Firm.

14. The Plaintiff forwarded this email to Attorney Moscarino upon receiving it.  Attorney Moscarino responded that she, Attorney Barker, and Attorney Montgomery instead wanted to schedule a Webex call for later that day.  Attorneys Barker and

        Moscarino were present on the call.  Attorney Montgomery was not.  The parties concluded that Benesch, Friedlander, Coplan & Aronoff LLP were best suited to handle the Plaintiff's legal claims against Waddington North America and Novolex Holdings.

15.       On October 14, 2022, the Plaintiff retained the law firm of Benesch, Friedlander, Coplan & Aronoff for a limited engagement.  On October 26, 2022, the Plaintiff sent a retainer via wire transfer of $20,000 to the law firm to commence their services.

16.       After retaining Attorneys Moscarino and Barker, the Plaintiff and her attorneys engaged in multiple communications regarding her claims.  Attorney Barker advised Plaintiff on a follow-up Webex call later in the year, along with Attorney Moscarino, that she did not have a viable trade secret claim, before even scheduling a call with opposing counsel, Defendant Summer.  The Plaintiff reiterated important details to her case and raised other viable legal paths.  Attorney Barker, seemingly caught off guard, agreed with the Plaintiff's approach, explaining that he had only been looking at this as a trade secret case.  All parties agreed to pursue this new legal approach.

17.       Damages were discussed extensively between all parties as well.  Attorneys Moscarino and Barker agreed that the Plaintiff had a very strong jury case that would yield large numbers in excess of $100 million.  After ultimately determining they could safely survive a motion to dismiss with Plaintiff's newly devised legal path, all parties agreed a fraction of the projected damages would be fair to ask for in settlement, with the threat of a trial heavily in Plaintiff's favor.

18.       On January 13, 2023, Attorneys Moscarino and Barker sent an email to F.M. Turner Company, requesting a phone call to discuss the Plaintiff's claims.  On January 17, they received a response in writing from the company's outside counsel, Erin Poplar

with Giardini, Poplar & Mason, LLC.  The response denied any wrongdoing on behalf of Mr. Godlewski and F.M. Turner.  Attorneys Moscarino and Barker made no response, indicating they first wanted to see how discussions with Defendant Summer and Novolex played out.

19. Discussions between Attorneys Moscarino and Barker and Defendant Summer began January 13, 2023, when Attorney Barker communicated to Defendant Summer that the Plaintiff was seeking well in excess of $1 million to settle the dispute.  Due to Defendant Summer's unprepared response to the Plaintiff's allegations and multiple mistakes he made on the initial call, the Plaintiff and Attorneys Moscarino and Barker were confident in forging some sort of settlement in subsequent discussions.

20. On February 13, 2023, Defendant Summer and Attorneys Moscarino and Barker met via Zoom once more to continue discussions.  During this call, Defendant Summer pivoted positions, stating that his client could now disprove the Plaintiff's claims with a document.  Attorneys Moscarino and Barker encouraged the Plaintiff to approve the transfer of this document under an attorneys'-eyes-only agreement, a practice they claimed was common.  Reluctantly, the Plaintiff agreed to this arrangement, stating that the team should remain on the same page that the document Defendant Summer was sending would likely be falsified.

21. Months after Defendant Summer claimed his clients had a document and a signed confidentiality agreement by all parties, he finally sent the evidence on March 20, 2023, in the middle of the night.  Attorneys Moscarino and Barker advised the Plaintiff that the document seemed legitimate, without describing its contents and stated this was enough to drop her case.  Unable to see the document, the Plaintiff pressed Attorneys

Moscarino and Barker for its contents.  Based on what Attorney Moscarino described to the Plaintiff, the Plaintiff could safely claim the document was falsified.

22. The Plaintiff and Attorneys Moscarino and Barker continued to have multiple communications, and disagreements, regarding the validity of the document and how best to determine that validity.  Meanwhile, upon further research, Plaintiff retrieved evidence showing she had been in contact with Waddington North America on the same date of the document, October 24, 2018, regarding her lid.  This indicated that either way, the document was fatal to Defendant Summer's claims that his client designed the lid before the Plaintiff.

23. The Plaintiff brought this startling fact to Attorney Moscarino's attention by telephone.  Attorney Moscarino did not have a reaction, and stated she would have to consult Attorney Barker on how to handle the matching dates.  Soon after, Attorney Moscarino sent an email to the Plaintiff, with Attorney Barker copied, downplaying the dates matching as "interesting" and continued to advise her that she did not have a case.  Attorneys Moscarino and Barker attempted to convince Plaintiff to take a Webex meeting over her stated concerns for their bias towards opposing counsel, but she did not reply.

24. The Plaintiff also requested to have the document inspected by a third party, in addition to the Benesch internal IT team, on a phone call with Attorney Moscarino.  Attorney Moscarino told the Plaintiff she believed this was permissible.  Later, via email, Attorney Moscarino revealed the confidentiality agreement in fact did not permit third party forensic review, and Novolex's written consent would need to be given.  Having now reached the peak of suspicion, the Plaintiff confronted

        Attorney Moscarino on the integrity of the representation after disagreeing on obvious material facts of the case, the conduct of Defendant Summer, multiple months of fruitless engagement and over $50,000 in fees.

25.     On April 26, 2023, the Benesch law firm terminated their representation of the Plaintiff without warning or explanation.

26.     On May 9, 2023, the Plaintiff attempted to retain a new firm based in Boston. The attorney requested to speak with the former partner on her case. She indicated he should call Justin Barker in the Benesch law firm Chicago office. After their call, she received an email from the attorney stating that Attorney Barker was now a partner with Defendant Nelson Mullins Riley & Scarborough law firm. After that, he declined to take her case. The Plaintiff had not been notified by Attorneys Moscarino or Barker nor Benesch law firm of this development. She later discovered Attorney Barker had taken a position with the Defendants the same month she was terminated by the Benesch law firm.

27.     Upon further investigation with an internal source, on May 17, 2023, the Plaintiff discovered that seven additional attorneys from the Benesch Law Firm and multiple clients, including a large energy company, had also departed with Attorney Barker to Defendants Nelson Mullins Riley and Scarborough law firm.

28.     The factual allegations of conduct set forth in the following claims permanently destroyed Plaintiff's viable underlying legal matters and therefore entitle her to significant recovery of losses.

## CLAIMS

### COUNT 1: FRAUDULENT INDUCEMENT

34. Defendants Nelson Mullins Law Firm and Summer never had any intention of resolving the Plaintiff's claims of product theft against their client. After being retained by Novolex Holdings, the Defendants were tasked with not only dishonestly disproving the Plaintiff's claims, but permanently damaging her ability to pursue any legal path to recovery. Therefore the Defendants induced the Plaintiff into discussions under a legitimate disguise with the above stated intent, leading to their unlawful access to her legal case to her detriment, making them guilty of fraudulent inducement.

### COUNT 2: FRAUDULENT OMISSION

35. Due to the confidential nature of Attorney Barker's employment negotiations with the Defendants during his representation of the Plaintiff, the Plaintiff had no ability to ascertain this fact on her own until after she was terminated as a client and Attorney Barker's employment transition was made public. The Defendants, under the law, were obligated to disclose to the Plaintiff that they were seeking to hire members of her legal team while also engaging her in representation of Novolex Company's interest in her legal claims against them. As a result of this unlawful omission, the Defendants continued to engage in this conflict of interest, and pursue access to Plaintiff's legal matter to her detriment.

### COUNT 3: FRAUDULENT MISREPRESENTATION

37. By omitting to disclose their conflict of interest, the Defendants fraudulently misrepresented their position in the settlement talks between the Plaintiff and Novolex Holdings. The Defendants misrepresented their position to the Plaintiff to avoid any question of impropriety, lack of goodwill or their intentions during these discussions. Instead, they utilized their disguise as counsel for Novolex Holdings in order to continue to infiltrate the Plaintiff's legal team and leverage their position to her detriment.

### COUNT 4: FRAUDULENT CONCEALMENT

38. Attorney Barker has admitted in writing to the Plaintiff that he was willfully engaged in a conflict of interest with the Defendants during his representation of her, and he has also admitted to willfully concealing that fact from her to honor a confidentiality agreement with the Defendants, while he was negotiating employment. By purposely hiding this material fact from the Plaintiff, the Defendants intended to mislead her under the disguise of legitimate settlement discussions. The Plaintiff continued to rely on all parties', including the Defendants', purported impartiality and unbiased representation while concealing this conflict of interest, leading to the detriment of her and her case.

### COUNT 5: CONSTRUCTIVE FRAUD

40. The Defendants falsely misrepresented to the Plaintiff their motives for entering into settlement discussions with her legal team. The Plaintiff relied on this misrepresentation in virtually all her decision-making surrounding the fake settlement discussions. This resulted in the Defendants' unlawful access to critical, intimate details of her case, irreparably damaging any path to recovery.

## COUNT 6: CIVIL CONSPIRACY

43. The Defendants colluded with the Plaintiff's legal team on a plan to harm her ability, irreparably, to pursue any recovery path stemming from the theft of her product design, in return for employment of Attorney Barker and his colleagues at Benesch Law Firm.

## COUNT 7: BREACH OF IMPLIED CONTRACT

44. The agreement to and commencement of settlement discussions with the Plaintiff's legal team created a contract of goodwill between all the parties to resolve the legal claims at hand.  The Defendants did not honor even the basic impartiality, honesty and ethical conduct required of any party entering into such a negotiation.  By enriching themselves to the detriment of the Plaintiff during the negotiation, they are guilty of breach of implied contract.

## COUNT 8: BREACH OF GOOD FAITH COVENANT AND FAIR DEALING

49. By breaching the contract for the reasons stated above, Defendants also breached the implied covenant of good faith and fair dealing required from said contract.

## COUNT 9: TORTIOUS INTERFERENCE

50. The Plaintiff and her legal team agreed that the Plaintiff had a viable breach of contract claim, among others, against F.M. Turner Company, for which Waddington North America was vicariously liable.  This proves that a business relationship existed between Plaintiff and opposition in her underlying legal matter.  By permanently prejudicing the Plaintiff's position in settlement discussions and a fair trial, the Defendants also destroyed the Plaintiff's leverage to forge a partnership centered around her patent as an alternative to a settlement or litigation.

### COUNT 10: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

51.     The conduct of the Defendants has caused physical and mental harm to the Plaintiff that has been medically documented.  The Defendants had reckless disregard for the implications their conduct would have on the Plaintiff and exacerbated her already tenuous mental state.

### COMPENSATORY DAMAGES

52.     Plaintiff is seeking $25,000,000 in compensatory damages.

### PUNITIVE DAMAGES

53.      Plaintiff seeks $50,000,000 in punitive damages as a deterrent for Defendants' conduct.  Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and Defendants' reckless disregard for the welfare of their client and her case.  Defendants intentionally and fraudulently misrepresented facts and information relevant to the case and their position to the Plaintiff.

DATED: May 20, 2024                         *PRO SE* PLAINTIFF, Amanda Sima

                                            */s/Amanda Sima*

                                            561 Bristolwood Lane
                                            Castle Pines, CO 80108
                                            614-260-8222
                                            mandasima@gmail.com